By the Court,

Nelson, Ch. J.
The first question in this case is, whether any or all of the facts presented by the special verdict constitute in judgment of law, a breach of the covenant declared upon? The words of it are as broad and comprehensive as the English language could well make it; and *255 as is apparent, were deliberately used to guard against the possibility of evading its intent and purport. It winds up by a stipulation that the defendants would not aid or assist, or be in any way or manner accessary to the printing or publishing of any papers, &c. That there has been a literal infraction of this part of the covenant can not be doubted; but we admit this is not always the proper criterion by which to determine whether a covenant has been broken or not, and that the court is bound to give to the words a reasonable construction with a view to arrive at the intent and meaning of the parties; and that this must be first ascertained before it can be determined whether a breach has taken place.
The meaning of the parties here, upon the language used, is plain enough. The plaintiffs had agreed to pay §3000 for the patronage and good will of the paper, and without some stipulation to the contrary, the defendants would have been at liberty to have immediately established another, and thereby have greatly interfered with the expected source of profit of the plaintiffs. The object of the covenant was to prevent the possibility of this injustice; and from the very cautious phraseology, to prevent it directly or indirectly. The defendants are not to print or publish, or aid or assist in, or be in any way accessary to the printing or publishing of any papers.
What constitutes aiding or assisting, or being in any way accessary to the printing and publication of a newspaper, is the question. It [452] must be conceded there may be acts of the defendants tending to promote the objects here forbidden, but which are so remote and accidental as not to be within the contemplation of the parties; and there is a good deal of difficulty in drawing the line between such acts and those intended to be prohibited. Thus, the mere sale of type, or of printing presses, might indirectly aid in the establishment of a paper; yet it could not reasonably have been contemplated by the plaintiffs that the defendant, Williams, was to give up a portion of his ordinary and established business. Many other like instances might be noticed. There is even some difficulty in saying that the sale of the type and renting of the press, - by Williams to Merrill, with a knowledge and for the express purpose of establishing a newspaper, the Intelligencer, in Utica, comes within the spirit of the prohibition; though it comes so near to, if not in fact being an infraction, that the experiment must, at least, be said to have been somewhat hazardous. It may be said in justification, that Williams was only acting in the line of his ordinary business, and that a knowledge of the purposes of his customer would not change the nature of the transaction; as in every case,» the' purchaser possessed the entire control as to the use of the material, and the difference between a purchase, with intent to use the articles for a particular purpose and the power to do so if he chose, so far as respects the covenant, is scarcely deserving the name of a distinction; at least-, we can hardly suppose it entered into the consideration of the parties, or that it would at all have influenced them if it had.
But the printing of the American Citizen is a much more direct and serious instance of an interference with the intent and purpose of the covenant. It is impossible to disguise by words, or deny that this is a political or miscellaneous newspaper, within the contemplation of the spirit and letter of the agreement, or that it was the first number of a series intended to be published, and that the defendant Williams so understood it; that it was not to be continued unless sufficient patronage was extended to it, is true; but this can not alter the nature of the transaction, for the same could probably be said in the case of every paper which he might choose to [453] assist, confessedly in direct violation of the agreement. At least the argument does not sound well from the mouth of the defendants in this case, who were engaged in a service tending to promote the success of the under *256 taking. It was an avowed and deliberate undertaking on the part of Wilson, permanently to establish a political newspaper, that must more or less conflict with the circulation and protits of the plaintiffs; and was a direct co-operation and assistance on the part of the defendant Williams. The printing and publishing of the first number was as objectionable, and even more so, as it was aiding in the experiment of the undertaking, as of the second or any subsequent number of the series; and the construction that would take the one out of the prohibition of the covenant under the circumstances, for aught that I can see, would authorize the printing and publication of the series, or of any other paper in the place. That the work was done by the job, or for compensation, does not vary the above view; because it certainly was not contemplated by the parties that the printing and publishing intended to be forbidden was such as should or would be done gratuitously. The plaintiffs would not probably have exacted security against aid or co-operation in commencing and building up a rival establishment on such terms. It could not have been presumed that the defendants would embark without any hope of gain in such an undertaking, to the injury of the plaintiffs. The stipulation, among other objects, was to guard against the influence which the offers or temptation of large profits from the business might have upon the conduct of the defendants. It seems to me, therefore, we are bound to say that here was a direct violation of the two different stipulations in the covenant namely: 1. Of the stipulation that the defendants would not suffer a paper to be printed or published in any building belonging to them, or either of them; and 2. Of the stipulation that they would not aid or assist, or be in [454] any manner accessary to the printing and publishing of the same by any person whatever.
The next question presented upon the above conclusion is whether the sum of $3000 is to be viewed as damages liquidated by the contract of the parties, or only in the light of a penalty ? There are many cases in the English books in which this question has been very fully examined and considered, but it would be an unprofitable consumption of time to go over them with a view or expectation of extracting any useful general principle that could be applied to this case. The following are the leading cases: Astley v. Welden, 2 Bos. & Pul. 346; Burton v. Glover, Holt’s N. P. R. 43, and note; Reilly v. Jones, 1 Bing. 302; Davies v. Penton, 6 Barn. & Cres. 216; Crisdee v. Bolton, 3 Carr. & Payne, 240; Randall v. Everest, 2 id. 577; Kemble v. Farren, 6 Bing. 141. In our court are the following: Dennis v. Cummins, 3 Johns. Cas. 297; Slosson v. Beadle, 7 Johns. R. 72; Spencer v. Tilden, 5 Cowen, 144, and note, p. 150; Nobles v. Bates, 7 id. 307; Knapp v. Maltby, 13 Wendell, 587. From a critical examination of all these cases and others that might be referred to, it will be found that the business of the court, in construing this clause of the agreement, as in respect to every other part thereof, is to inquire after the meaning and intent of the parties; and when that is clearly ascertained from the terms and language used, it must be carried into effect. A court of law possesses no dispensing powers; it can not inquire whether the parties have acted wisely or rashly, in respect to any stipulation they may have thought proper to introduce into their agreements. If they are competent to contract within the prudential rules the law has fixed as to parties; and there has been no fraud, circumvention or illegality in the case, the court is bound to enforce the agreement. Men may enter into improvident contracts where the advantage is knowingly and strikingly against them; they may also expend their property upon idle or worthless objects, or.give it away if they please without an equivalent, in spite of the powers or interference of the court; and it is difficult to see why they may not fix for themselves by agreement in advance, a measure of compensation, however extravagant it may be, for a violation of their covenant (they surely may *257 after it has accrued), without the intervention of a court or jury. Can it be an exception to their power to bind themselves by lawful contract? We suppose not; and regarding the intent of the parties; it is not to be doubted but that the sum of §3000 was fixed upon by them “ mutually and expressly,” as they say, “ as the measure of damagés for’the violation of the covenant, or any of its terms or conditions.” If it be said that the measure is a hard one, it may be replied, that the defendants should not have stipulated for it; or having been thus indiscreet, they should have sought the only exemption, which was still within .their power, namely, the faithful fulfillment of their agreement.
In the case of Astley v. Weldon, Lord Eldon repudiates the idea that had been thrown out in- some of the previous cases, that if the sum would be enormous and excessive, considered as liquidated damages, it should then be taken as a penalty; and maintains the ability of the party to make a contrao-t for himself in fixing the amount of damages as well as in respect to any other matter. All the judges adopt the position that the question must be determined upon the meaning and intent of the parties. A principle is stated in that case which has since been frequently applied, and upon .which the case was finally disposed of, namely, that where a doubt appears whether the sum inserted be intended as a penalty or not,-if a certain damage less than this sum be made payable upon the face of the instrument, in case the breach occurs, then the same shall be construed to be a penalty. It then partakes of the character of a common money bond, where the payment of a small sum is secured by the forfeiture of a large one in case of default. In that case there were several stipulations in the articles of agreement, and then on either neglecting to perform on his part the “ sum of £200, to be recovered in any of his majesty’s courts of record,” was to be paid. Some of the breaches were in their nature uncertain; while others were certain, and as the £200 were given to secure the fulfillment of all of them, upon the principle above stated, the court concluded it was to be deemed in the light of a penalty. Chambre, J.. p. 345, observed, “ that there was one case in [456] which the sum agreed for must always be considered a penalty; and that is, where the payment of a smaller sum is secured by a larger.” And he held that the court could not garble in the covenants, and hold that in respect to those certain the large sum was to be deemed a penalty, but damages liquidated as to those uncertain, as the concluding clause applied equally to all of them. The decision of the case of Kemble v. Farren, the strongest one in the books for the defendants, was put upon this principle by Chief Justice Tindall. There some of the stipulations were certain, such as the one in which the plaintiff had agreed to pay the defendant £3 6s. 8d. every night-in which the theatre would be open during the season; others were uncertain. The language of the parties in fixing the sum in case of neglect to fulfill the agreement, or any of the stipulations, was as particular and specific as in the case under consideration, using affirmative and negative terms, to exclude the idea of a penalty; but as it extended equally to the breach of every stipulation, those certain as well as those uncertain, the case was supposed to be brought directly within the principle of Astley v. Walden. The chief justice concedes that it was difficult to suppose words more precise or explicit, and admitted that if the clause had been limited to breaches which were of an uncertain nature and amount, the court would have considered it as having the effect of ascertaining the damages of any such breach at the £1000; and he adds, “ for we see nothing illegal or unreasonable in the parties, by their mutual agreement, settling the amount of damages, uncertain in their nature, at any sum upon which they may agree.” The case under consideration falls directly within the above distinction; for the concluding clause here, securing the fulfillment of the preceding covenant, applies *258 to stipulations wholly uncertain; and it may be added, that from the nature of the case, it would be impossible for a court and jury to ascertain with any degree of accuracy, the.amount of damages actually arising out of the breach of them to the prejudiced parly; and was, therefore, a very fit and [457] proper case for the liquidation of the amount by the parties themselves. They have adopted the precise sum which the plaintiffs were to receive for the good will and patronage of the press, the very benefit which this clause was intended more effectually to secure to the purchasers.
It appears by the special verdict that Dakin, one of the plaintiffs, and who then was possessed of the interest of his co-purchaser, on the 22d January, 1830, released, under hand and seal, the defendants from the obligations of the covenant, so far as respected the printing, publishing and editing of an anti-masonic paper, called the Elucidator ; and it is now contended that this partial release, by operation of law, extinguished the covenant. If this has been the legal effect, it is clear that the court must give operation to it far beyond the intent and understanding of the parties, and must do so upon the strength of some fixed technical rule of. law. The principle ivhich governs in the construction of all instruments, as a general rule, is applicable to this one; and it belongs to the party insisting upon the exception, if one exists, to furnish the authority for it. Dumpor’s case, 4 Co. 119, has been referred to; it is also reported i:i Cro. Eliz. 815, under the title of Dumper v. Syms. There the main question was, whether a license to the lessee to alien given by the lessors (where the lease contained a condition that the lessee or his assigns should not alien without such license), operated as a dispensation only in respect to such lessee, or determined the whole condition. The court decided that the condition was discharged altogether by the dispensation to the lessee himself. The reasons given certainly do not seem very satisfactory or conclusive; they are these: that the license gave to the lessee the power to convey an absolute interest, free from the restraint of the condition, and the assignee taking this interest, held it'absolute and discharged from the restraint; that the lessors could not dispense with an alienation at one time, and the estate be subject to the condition afterwards; and that as a dispensation of one alienation it operated as a dispensation to all others; and the same as to the persons; for if the lessors dispense with one, all others [458] were at liberty, and therefore the word assigns being mentioned in the condition made no difference. Now, the common sense view of a license to the lessee only, and the one coinciding with the apparent intent of the parties, would seem to be, that it merely enabled him to alien the premises, leaving the operation of the covenant in the lease in full force upon the assignee. To say that it empowered him to assign an absolute estate to the extent of his interest, free from the condition, is assuming the point in question. Was this the intent of the parties, as evinced by their contract? If not, the purchaser could not set up a just claim to an exemption, because, knowing the condition against alienation in the lease, it behoved him to see that a license had been given; and if it only extended to the lessee, he purchased wfith full knowledge of the effect- of it. The law, however, of this case is well settled, and we do not intend to disturb it. It has even been determined that where a license was given to one of three lessees, the condition was dispensed with as to all, and. that where consent is given to alien part of the demised premises, the whole may be aliened. The doctrine appears to be founded upon the idea, that the condition can not be divided or apportioned, though I am free to confess that I see no practical difficulty in* this respect. The correctness of the case has been sometimes questioned, but its authority has never been overruled or denied that I can find. See 1 Ves. & Beame, 190; 14 Ves. 175; 4 Taunt. 735; Platt on Cov. 425, 6, 7; 1 Selw. N. P. 357, tit. Covenant; 5 Taunt. 249; 1 Saund. 287, c. n. 16; Shep. Touch. 159.
*259 The principle, however, is not applicable to ordinary covenants not coupled with a condition, as these are frequently made divisible and subject of apportionment (Congham v. King, Cro. Car. 221; Ards v. Watkins, Cro. Eliz. 637. 651; Stevenson v. Lambard, 2 East, 575; 5 Barn. & Cress. 479 ; 2 Barn. & Ald. 105). There surely would have been no difficulty or objection to the validity of this covenant, if the paper afterwards taken out of its operation by the release, had been originally made an exception; and it appears to me that this is the only effect of that instrument. The covenant prohibits the establishment of, and the printing and publishing of any and all [459] newspapers; the release excepts out of it one, particularly specified and defined, and nothing more. Until it becomes a rule in mathematics that a part includes the whole, it is impossible, with the semblance of reason, to say that the release of the one operated upon all. This view also shows how little difficulty there can be in dividing the covenant, or rather, perhaps, the subject matters upon which it operates, so as to discharge one part therefrom, without affecting the covenant in respect to the remainder.
It was urged on the argument, assuming there had been a violation of the covenant, that the damages were liquidated and were not in the nature of a penalty, and that the release had not the effect to discharge them; still that it was a discharge of a portion of the damages, and therefore an assessment was necessary in order to ascertain those to which the plaintiffs were entitled. The difficulty in this view is, that it assumes what the case does not authorize, namely, that the whole sum became collectable only upon an entire breach of the covenant, or rather of every stipulation in it, and that as a portion of it had been given up, a ratable deduction should be made in the damages. But it will be seen that this sum in damages was stipulated for, not only to. secure the faithful performance of the whole covenant, but of “ every part, term and condition thereof,” and that it was “ fixed and settled as liquidated damages, &c., for any violation of the preceding covenant, or any of its terms or conditions.” The contingency, therefore, upon which it was agreed to be paid, is as well upon the doing of one of the prohibited acts, as upon all of them; and if any part of the sum is forfeited, the whole must be.
For the above reasons we are of opinion the plaintiffs are entitled to judgment for the $3000.